UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

COURTNEY TWYON BEANER  CIVIL ACTION NO. 10-cv-1884

VERSUS  JUDGE STAGG

LOUISIANA STATE PENITENTIARY  MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Courtney Beaner ("Petitioner") of two counts of second degree murder in connection with a drive-by shooting.  His convictions and concurrent life sentences were affirmed on direct appeal.  State v. Beaner, 974 So.2d 667 (La. App. 2d Cir. 2007), writ denied, 983 So.2d 896 (La. 2008).  He also pursued a state post-conviction application.  Petitioner now seeks federal habeas corpus relief on several grounds.  For the reasons that follow, it is recommended the petition be denied.

### Facts

Members of two gangs, one from the Hollywood Heights area of Shreveport and the other from the Cedar Grove area, exchanged threats at a pep rally at Woodlawn High School.  The following Monday, a gunfight broke out between members of the gangs as the school day ended.  One student was shot in the leg.  A member of the Hollywood group was identified as the shooter and arrested.

Later that afternoon, Petitioner and several other young men from the Cedar Grove area were gathered outside a home on West 76th Street.  A car containing members of the Hollywood group drove past, and there was an exchange of gunfire.  No one was injured.

Later that evening, a witness heard Petitioner and others discussing the fight at Woodlawn and making a plan to retaliate against Randy Wilson, who they said was a member of the Hollywood group and had fired shots at them at the West 76th Street home.  Some of the group dressed in black clothes, and they drove away in a white Honda car.

At around 9:00 p.m. that night, the white Honda approached a home near Hattie Perry Park where several members of the Hollywood group were gathered.  Those in the yard included the targeted Randy Wilson.  Occupants of the Honda fired numerous shots from the sunroof and rear windows of the car toward those gathered in the yard.  Randy Wilson was injured by a shot to the left arm, 15 year-old Chiquita Chambers (whose brother had been arrested earlier for the shooting at Woodlawn) and 18 year-old Jermichael Lewis were killed.

The police investigation led to a search of the house where Petitioner and the others in his group were heard making their plans.  The search revealed a Lorcin .380 caliber semi-automatic pistol and a Bryco .380 semi-automatic pistol.  A firearms expert testified that the bullet recovered from Chiquita's body was fired from the Bryco, and six of the .380 casings recovered at the crime scene were fired from the same pistol.  Five other .380 casings at the crime scene were fired from the Lorcin pistol.  The bullet recovered from Lewis' body was fired by a .40 caliber semi-automatic pistol, as were six .40 caliber casings found at the scene.

**Waiver of <u>Miranda</u> Rights**

Petitioner filed a motion to suppress statements he made to police on the grounds that he did not have the mental capacity to understand his <u>Miranda</u> rights and make a knowing and intelligent waiver.  Judge Jeanette Garrett held a hearing (Tr. 937-1021) at which two detectives and Petitioner testified.  The evidence showed that, before taking the first unrecorded statement, a detective asked about Petitioner's education.  Petitioner said he completed the 12th grade and graduated, and he knew how to read and write.  A detective gave Petitioner a written copy of the <u>Miranda</u> rights card and asked him to read along with him.  Petitioner indicated that he understood the rights and wished to waive them.  He signed the form.  Petitioner then gave a statement in which he denied involvement in the shooting and gave the detectives an alibi that he was elsewhere playing solitaire and watching TV.  Petitioner was placed under arrest for first degree murder.  He signed a consent to a DNA swab.

About two hours later, detectives returned and said that they had spoken to another person who had been in the car during the shooting, and they asked Petitioner if he was ready to tell the truth.  Petitioner said yes, and a recorded interview followed.  Petitioner gave the same information about his education and once again said he understood and waived his <u>Miranda</u> rights.  He again signed the card.  Petitioner then gave a detailed account of the shooting, including an admission he was in the car and participated.

Petitioner testified at the suppression hearing that he told the detectives he understood his <u>Miranda</u> rights, but he did not really understand them, and he did not know how to read.

He claimed to have made the statements because a detective promised he would be released to is parents if he "owned up to the gun."

The State introduced psychiatric reports from Dr. Dean Robinson and Dr. Greg Brown, which had been used earlier to determine Petitioner was competent to stand trial. The reports indicated that Petitioner understood the nature of the charges and related matters. He was said to have low intellectual functioning, but he was not diagnosed as mentally retarded.

Judge Garrett denied the motion to suppress and gave detailed reasons for her ruling. She found that Petitioner was "playing possum with the court" and trying to make everyone think he was not intelligent.  She said it appeared to be "an act," and it was inconsistent with Petitioner's ability to, for example, explain why detectives took a DNA swab, provide a complete chronological account of the shooting incident, describe the cars involved in great detail, give first and last names of persons involved and explain their family relations, describe in great detail different types of guns and their calibers, and explain whether a car drove east or west on a street.  Defense counsel argued that Petitioner's diminished capacity was shown by the fact that he printed his name when he signed waiver forms.  Judge Garrett responded that she had a son who graduated in the top five percent of his class who wrote all of his high school papers in print and signed his name in print because he could do so more quickly than in cursive.  Tr. 1015-20.

Petitioner later reurged his motion to suppress based on newly discovered evidence that he may have sustained brain damage at birth.  Judge Scott Crichton conducted a hearing

on that motion and heard testimony from Dr. Brown and Dr. Robinson.  He also heard

lengthy testimony from Dr. Mark Vigen, a psychologist who testified that Petitioner suffered

from mild hydrocephalus and mild intracranial bleeding at the time of birth.  Dr. Vigen

testified that Petitioner scored a verbal IQ of 62, a performance of IQ of 73, and a full-scale

IQ of 63.  He administered a standardized multiple choice test designed to determine

competency to stand trial, and Petitioner passed the test.  He noted that Petitioner's school

records and other information were consistent with someone suffering from mental

retardation.  He noted that Petitioner received a "certificate of achievement" and was not a

regular graduate from high school.  He estimated Petitioner had the academic and intellectual

development of an 8-year-old and could understand information read at a third-grade level.

Dr. Vigen testified, with regard to whether Petitioner could understand his <u>Miranda</u>

rights, that if he was going to err it would be on the side of saying that more likely than not

he did not understand because the warning was an abstract or conceptual matter that required

a lot of understanding.  Dr. Vigen admitted that he did not have a strong opinion on the issue,

and he acknowledged that Petitioner's answers to an evaluation that asked about the

warnings demonstrated Petitioner's understanding that he did not have to talk to police unless

he chose to do so.

Dr. Brown testified that Petitioner was able to understand his <u>Miranda</u> rights and

waive them even though he was in the mild mental retardation range.  Dr. Brown testified

that Petitioner told him during a competency evaluation that he understood his <u>Miranda</u>

rights.  Petitioner also told Brown that he wanted to negotiate a plea bargain to avoid a life

sentence.  Dr. Robinson testified that Petitioner had the capacity to understand his Miranda rights, but he said it would take Petitioner longer than the average person to understand those rights.  He diagnosed borderline or mild mental retardation.

Ms. Faye Williams, a cafeteria worker at Captain Shreve High School, testified that Petitioner worked in the cafeteria as part of the special education program.  She said other students attempted to take advantage of him and sometimes talked him out of his lunch money.  Their ability to do so was aided by his general desire to please people.  She also described how Petitioner had difficulty following simple instructions such as how to retrieve a broom and dustpan to sweep up a mess or wash dishes.

Judge Crichton heard oral arguments on a separate date and then gave a detailed ruling from the bench that denied the motion to suppress.  He found that Petitioner was mildly mentally retarded but, based on a totality of the circumstances, was competent to make a knowing and voluntary waiver of his Miranda rights.  He disagreed with Judge Garrett's assessment that Petitioner was playing possum or malingering, but he found that Petitioner was "way more street smart than as presented to the court," and he pointed to questioning by Dr. Vigen's partner in which Petitioner explained in his own words what the Miranda rights meant, and he did so accurately.  That ability was deemed significant in the analysis. Tr. 1329-36.

The state appellate court reviewed this matter on direct appeal.  It reviewed the evidence in much more detail than presented above.  The court observed that low intellect, moderate retardation, or diminished mental capacity does not per se vitiate capacity to make

a free and voluntary statement or a knowing and intelligent <u>Miranda</u> waiver.  The court acknowledged that it was an important factor, but the issues must be considered on a case-by-case basis under a totality of the circumstances standard.  The court proceeded to review the factors in the evidence, cited by the trial judges, that supported their decisions.  It found the evidence sufficient to affirm the trial court rulings.  <u>State v. Beaner</u>, 974 So.2d at 671-78.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  <u>Pape v. Thaler</u>, 645 F.3rd 281, 287 (5th Cir. 2011).  A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable.  <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862 (2010).

A defendant's waiver of his <u>Miranda</u> rights must be knowing and intelligent, and it must be voluntary, judged under the totality of the circumstances.  <u>Moran v. Burbine</u>, 106

S.Ct. 1135 (1986).  Mental condition alone is not sufficient to show that a waiver was not voluntary; Miranda protects only against governmental coercion.  Colorado v. Connelly, 107 S.Ct. 515 (1986).

There is no serious argument of coercive tactics or other evidence that would make the waiver involuntary.  And "federal courts generally reject claims that Miranda waivers are involuntary based upon a defendant's low mental functions, below-average IQ, or illiteracy." U.S. v. Sauseda, 2013 WL 1694061 (5th Cir. 2013).  The focus of the habeas argument is on whether the waiver was knowing and intelligent, given Petitioner's diminished mental capacity.  The state courts, at the trial and appellate levels considered the relevant evidence with great care, applied the proper governing principles, and gave well reasoned and reasonable decisions.  There was certainly a spirited and good-faith argument for the defense presented in the state courts.  But once the state courts ruled, the decision became reviewable in this court only under the demanding standard of Section 2254(d).  There may still be room for some argument, but there is no basis to conclude that the state court decision was an objectively unreasonable application of the knowing and intelligent waiver requirement.

The Fifth Circuit recently affirmed denial of habeas relief in an unpublished decision that presented similar facts.  The Petitioner had an overall IQ of 65, in the range of mild mental retardation, but he had sufficient awareness to attempt an alibi.  The state courts found the waiver proper and, citing the substantial deference owed the state court's determinations, the Fifth Circuit agreed with the district court that habeas relief was not available.  James v. Cain, 468 Fed. Appx. 401 (5th Cir. 2012).  See also U.S. v. Williams, 420 Fed. Appx. 384

(5th Cir. 2011) (affirming finding of proper Miranda waiver by borderline mentally retarded defendant).  Habeas relief is not available on this claim.

**Motion for New Trial; Chain of Custody**

Dr. George McCormick, the long-time Caddo Parish coroner, died less than a week before trial began.  Deputy Coroner Greg Clement testified that Dr. McCormick would have been the person who performed the autopsies of the two victims, because McCormick was always present during autopsies, and would initial evidence.  Clement testified, with respect to the chain of custody of the fatal bullets, that he received two vials, each with a separate autopsy number for Lewis and Chambers, labeled as bullets removed from decedent.  The vials were initialed GM.  Clement delivered them to the Crime Lab, where ballistics analysis showed that the bullet removed from Chambers' body was fired from Petitioner's gun.

It came to light during the middle of trial that Dr. McCormick may not have performed all autopsies attributed to him.  Rather, his assistant, Lisa Hayes, often performed the autopsies.  The District Attorney's office launched an investigation into the practices of Dr. McCormick and the coroner's office.  After trial was over,  evidence was discovered that suggested McCormick may not have performed the two autopsies at issue.

Petitioner filed a motion for new trial based on the newly discovered evidence.  The trial court held an evidentiary hearing over four days.  Lisa Hayes testified that she assisted Dr. McCormick with all of his autopsies for the past few years and that he had taught her to perform the task, including how to remove bullets to preserve for evidence.  She described

the procedures that were followed to preserve bullets, but she did not have any independent recollection of the two autopsies at issue.

Deputy Coroner Greg Clement changed his testimony from trial and admitted that Dr. McCormick was absent during autopsies he witnessed.  Clement admitted that McCormick sometimes never viewed the projectiles removed from bodies.  Clement was not, however, present at these two autopsies so lacked personal knowledge of who performed them or removed the bullet from Chambers' body.

Dr. James Traylor, an expert in forensic pathology, testified that McCormick's absence at the time of the autopsy would have been substandard, but it did not compromise the integrity of the autopsy results or the chain of custody of the bullet removed from the body.  He stated that the chain of custody was maintained so long as the bullet was collected and appropriately labeled and kept in a secure location until transferred to the Crime Lab.

The trial judge denied the motion for new trial in a written decision.  The state appellate court affirmed, primarily because there were sufficient facts to prove Petitioner's guilt without the ballistics evidence and, whether it was McCormick or Hayes who performed the autopsy, the State had proved that the bullet admitted at trial came from Petitioner's gun and was removed from Chambers' body.  Even without the ballistics evidence, Petitioner would have been guilty as a principal to second degree murder of Chambers based on his participation in the shooting and admitted firing of several rounds towards the victims.  He was, based on the principal doctrine, convicted of the second degree murder of Jermichael Lewis even though the shot that killed Lewis came from the gun of

another occupant in the car.  As for the chain of custody, the court reasoned that the law does not require that evidence eliminate all possibilities the bullet analyzed by the Crime Lab was not the bullet connected with the case.  And there was no evidence adduced at the new trial hearing to suggest the bullet was "misplaced, mislabeled, or altered."  State v. Beaner, 974 So.2d at 678-83.

Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied.  Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief.  The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair.  Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991).  The evidence must have had a substantial and injurious effect or influence in determining the jury's verdict.  Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

The essence of Petitioner's argument is that the chain of custody evidence is unreliable so that the ballistics evidence should not have been admitted.  This is simply a state court evidentiary issue that is not cognizable on habeas review.  See, e.g. Patterson v. Cain, 2012 WL 1933748, *7-8 (E.D. La. 2012) (rejecting chain of custody argument for blood sample as mere violation of state evidentiary rules).  Petitioner has referenced federal arguments under Brady, Napue (knowing presentation of false evidence), and other theories based on the coroner's office scandal.  Assuming such claims were properly presented and

exhausted in the state courts, they lack merit because each of them requires a showing of prejudice.  The state court explained why Petitioner's conviction would stand even without the ballistics evidence and why that evidence was properly admitted despite the problems at the coroner's office.  Habeas relief is not available with respect to the motion for new trial issues.

**Right to Confrontation; Death Certificates and Autopsy Summarys**

Before Deputy Coroner Clement testified at trial about the chain of custody of the bullets, there was lengthy argument regarding the admissibility of the death certificates of the victims and a two-page summary or proces verbal of the autopsy report.  The State relied on La. C. Cr. P. Art. 105, which provides that a "coroner's report and a proces verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact." Defense counsel objected that admitting the documents violated Confrontation Clause rights as set forth in Crawford v. Washington, 124 S.Ct. 1354 (2004).  The prosecutor countered that the documents were merely ministerial and did not include any testimonial type evidence.  The trial judge agreed and noted that there was really no contest that the two victims died of gunshot wounds.  Tr. 2358-76.  Petitioner has not directed the court to anywhere later in the course of the trial where these exhibits were actually used other than when Clement identified the autopsy number given to each victim.

Petitioner argued on direct appeal that the admission of the documents violated Crawford and related principles.  The state appellate court said that the crux of Petitioner's argument actually centered on the bullet chain of custody argument addressed above.  The

death certificates were described as general descriptions of the cause of death, with nothing testimonial or that implicated "Petitioner." The report or proces verbal stated that Chambers' death was caused by a gunshot wound of the chest, but "defense counsel conceded at trial the deaths and causes of death for both Chambers and Lewis." Thus, the report was deemed both cumulative and harmless. State v. Beaner, 974 So.2d at 683-87.

Petitioner continues to argue that Crawford was violated by the admission of these exhibits, but he has not identified any statements from those exhibits that were testimonial and harmful to the defense. Crawford held that out-of-court statements by a witness that are testimonial are barred, under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness, regardless of whether such statements might be deemed reliable. Thus, a wife's out-of-court statements to police officers about her husband stabbing her violated the Confrontation Clause. Crawford did not spell out a comprehensive definition of what would be testimonial but said that at a minimum it included prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and police interrogations. The court later held in Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527 (2009) that certificates of analysis sworn by analysts at a state laboratory, attesting that a substance analyzed was cocaine, were affidavits within the core class of testimonial statements covered by the Confrontation Clause. See also Bullcoming v. New Mexico, 131 S.Ct. 2705 (2011) (applying Crawford to a blood-alcohol analysis report in a DWI case).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). The time-frame at issue is relevant to whether a state court adjudication ran afoul of a clearly established Supreme Court holding. At the time of the last state court adjudication on the merits of Petitioner's Confrontation Clause claim, the writ denial in May 2008, the Supreme Court had issued Crawford but had not yet begun to clarify what would be considered testimonial, and it certainly had not extended the definition to include items such as lab reports. Cases such as Melendez-Diaz and Bullcoming were not decided until later, so their holdings are not applicable to the habeas analysis in this case. Greene v. Fisher, 132 S.Ct. 38 (2011).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

The state appellate court held that the autopsy report was non-testimonial in nature so did not trigger the Crawford mandate for cross-examination. It does not appear that this decision was contrary to or an unreasonable application of Crawford as the scope of that case

was then understood and given the fairly dry facts in the documents that did not accuse Petitioner of anything.

There is a second obstacle to habeas relief even if it is assumed that the state court's decision was an objectively unreasonable  application of <u>Crawford</u> as it stood at the time of the state court decision.  A Confrontation Clause violation is subject to a harmless error analysis. <u>See</u> <u>Bullcoming</u>, 131 S.Ct. at 2719 n.11 (2011) (finding Confrontation Clause error and noting that "nothing in this opinion impedes a harmless-error inquiry on remand"); <u>U.S. v. Harper</u>, 527 F.3d 396, 400-01 n.3 (5th Cir. 2008).  A federal habeas court may grant relief on account of constitutional error only if the error had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Brecht v. Abrahamson</u>, 113 S.Ct. 1710 (1993); <u>Horn v. Quarterman</u>, 508 F.3d 306, 322 n.24 (5th Cir. 2007).

Petitioner has not pointed to anywhere in the record where the challenged documents were read to the jury or used by a witness in any direct manner to help prove any disputed fact.  Their mere admission into evidence did not have a substantial and injurious effect on the verdict that was well supported by the other evidence.  Any error was harmless under these circumstances.  Similar claims were rejected, based on harmless error, in <u>Russell v. Cooper</u>, 2013 WL 1197203 (W.D. La. 2013) and <u>Anderson v. Warden</u>, 2013 WL 1405423 (W.D. La. 2013).

**Excessive Sentences**

The mandatory sentence for second degree murder is life imprisonment without benefit of probation, parole, or suspension of sentence.  There was some question at

sentencing as to whether consecutive or concurrent sentences were appropriate under state law.   Judge Crichton stated that, given Petitioner's mental status, he believed concurrent sentences were appropriate, and those sentences were imposed.  Tr. 2564-65.  Petitioner later filed a motion to reconsider the sentences and argued that it was cruel and unusual punishment within the meaning of the Louisiana and United States Constitutions to impose life imprisonment on a person with apparent handicaps.  Tr. 568-575.  When the issue was briefed to the appellate court, it was presented solely in terms of state law.  Tr. 3071, 3113-15.  The state appellate court discussed the ability of trial judges, under the Louisiana Constitution, to make a downward departure from a mandatory minimum sentence in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional.  The rule is invoked most often in habitual offender cases where the past offenses have not been very serious, but there are rare circumstances in which a mandated sentence for a single crime like aggravated rape or murder could be altered.  The appellate court found that such a departure was not required in this case because Petitioner, who was competent and found to have acted with specific intent to kill, fired a gun in a crowd during a drive-by shooting that resulted in the deaths of two bystanders.  The court characterized this as an appalling disregard for the sanctity for human life and deserving of mandatory life sentences.  State v. Beaner, 974 So.2d at 687-88.  Petitioner repeated his state law arguments in his petition for supervisory writ to the Supreme Court of Louisiana.  Tr. 3224, 3264-66.

One aspect of exhaustion requires that the claim be presented to the state court within a federal constitutional framework.  Scott v. Hubert, 635 F.3d 659, 667 (5th Cir 2011), citing Baldwin v. Reese, 124 S.Ct. 1347 (2004).  The State argues that Petitioner did not present his sentencing claim as a federal one.  The determination of whether the claim was presented in such a fashion is made by looking to the briefs filed in state court.  Smith v. Digmon, 98 S.Ct. 597 (1978); Soffar v. Dretke, 368 F.3d 441, 467 (5th Cir. 2004).

An argument for lack of exhaustion of a federal issue would be well served by pinpoint record references, as demonstrated above, for the relevant motions and briefs and the pages where the relevant arguments were presented.  The court has taken the time to locate them on its own and agrees that, despite the reference to the U.S. Constitution in the original motion, a federal claim regarding the sentences was not properly presented in the direct appeal briefs.

Even if the presentation had invoked federal law, the claim would lack habeas merit. Petitioner has not identified any Supreme Court decision that held that a mandatory life sentence for an adult convicted of murder is unconstitutionally excessive.  The Court has, however, upheld a mandatory life sentence for a recidivist whose third felony conviction was obtaining $120.75 by false pretenses and whose prior crimes were similar property crimes. Rummel v. Estelle, 100 S.Ct. 1133 (1980).  The Court has also upheld a mandatory life sentence without possibility of parole for a conviction of possession more than 650 grams of cocaine, despite a lack of consideration of mitigating factors such as no prior felonies. Harmelin v. Michigan, 111 S.Ct. 2680 (1991).  Habeas challenges to Louisiana life sentences

for murder have been rejected based on those decisions.  See Holmes. v. Tanner, 2011 WL 5869396, **6-7 (E.D. La. 2011); Taylor v. Cain, 2007 WL 1805668, **20-21 (E.D. La. 2007). Petitioner is unable to demonstrate that the adjudication of his excessive sentence claim involved an unreasonable application of clearly established Supreme Court precedent, so relief is not available on this claim.

**Ineffective Assistance of Counsel**

Petitioner was indicted by a grand jury on two counts of first degree murder.  The district attorney later signed an amended indictment for lesser charges of second degree murder, but the amended bill was not endorsed a true bill by the grand jury foreman.  The state appellate court, in conducting a review for errors patent, noted that the state criminal code required the prosecution for second degree murder be instituted by a grand jury indictment.  District attorneys may amend indictments to charge lesser offenses, but the lack of a true bill endorsement in this circumstance was an error under state law.  The court stated that the error was waived due to the lack of a motion to quash filed before trial.  State v. Beaner, 974 So.2d at 688.

Petitioner argued in a post-conviction application that trial counsel was ineffective for not filing a motion to quash the amended indictment and raising the defect.  The trial court held that Petitioner was not prejudiced by the lack of a motion to quash because, despite what the appellate court said, the amended indictment was not defective.  Tr. 3756-58.  The

appellate court recited the two elements of a <u>Strickland</u> claim and summarily held that Petitioner "failed to meet either of these elements."  Tr. 3767.[1]

This court need not attempt to resolve the propriety, under state law, of the amended indictment.  It suffices to say that Petitioner cannot establish the prejudice prong of <u>Strickland</u> because there is no doubt that, if counsel had filed a meritorious motion to quash, the State would have cured the issue by having the foreman endorse the amended indictment or, if necessary, obtaining a new indictment for second degree murder.  The State was able to obtain a grand jury indictment for capital first degree murder, so there is no reason to doubt they would have easily obtained an indictment for second degree murder (especially considering the State was able to prove guilt beyond a reasonable doubt at trial).  The Fifth Circuit has rejected a <u>Strickland</u> claim in similar circumstances where counsel was faulted for not filing a motion to quash a grand jury indictment that was issued by a grand jury that was selected in violation of the Equal Protection Clause.  <u>Pickney v. Cain</u>, 337 F.3d 542 (5th Cir. 2003).

Petitioner's final argument is that his appellate counsel was ineffective because she did not request an error patent review.  Louisiana Code of Criminal Procedure Article 920 provides that appellate courts may consider only (1) an error designated in the assignment

---

[1] To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. <u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2064 (1984).

of errors and (2) error that is discoverable by a mere inspection of the pleadings and proceedings.  The latter is commonly referred to as error patent review, and it is conducted by the court without the need for counsel to make a request.  Such a review was conducted in this case, as evidenced by the amended indictment discussion in the appellate decision.

Petitioner nonetheless faults appellate counsel for not requesting the error patent review.  A claim of ineffective assistance of appellate counsel requires a showing that, had counsel acted as the client argues counsel should have, there is a reasonable probability the client would have won on appeal.  Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).  Petitioner has not demonstrated what counsel would have gained had she requested something the court already provided, and he certainly has not shown that an unnecessary request for error patent review would have given rise to a reasonable probability that he would have won his appeal. Relief is not permitted on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 25th day of July, 2013.


MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE